We'll turn to U.S. v. Silver. We're going to wait for some transfer of populations. Can we close the door, please? Okay, Mr. Mollo. Good morning. May it please the Court. I'm Stephen Mollo, and I represent Sheldon Silver. We come before the Court this morning seeking a judgment of acquittal or, at a minimum, a new trial based upon the jury instructions which were rendered erroneous by the United States Supreme Court decision in McDonnell. McDonnell reversed Hobbs Act and Honest Services convictions because the jury was given an overly broad definition of the term official acts. The Supreme Court reasoned that a definition of official acts that is too broad can ensnare routine interactions between officials and constituents inherent to representative government. So it imposed a three-part test to determine whether or not an act is official. It first must be a decision or action involving a formal exercise of governmental power. That has to be on a question, matter, or proceeding similar to an agency determination, a committee hearing, or a suit before a court, and it has to be pending or likely to be brought by law before the public official. Significantly, McDonnell said that simply taking or arranging a meeting is not sufficient to be an official act or advocating to another official to take an official act is not an official act unless there's intended pressure. The government has made a point that you didn't actually ask for an instruction in regard to whether meetings would, in fact, constitute a governmental action. Do you think that's relevant? The instruction that we asked for, Judge Sessions, was specifically, we tendered an instruction that was based upon the question presented in McDonnell, and I think this is significant because it plays out later in a moment about how the government chose to try the case. We all knew McDonnell was pending. We took the McDonnell question presented, and the jury instruction that we tendered said, to prove an official act, the government must prove the exercise of actual governmental power, the threat to exercise such power, or pressure imposed on others to exercise actual governmental power, straight from the McDonnell question presented. Now, the fact that we didn't anticipate every nuance of every sentence that would be written in the McDonnell opinion doesn't matter. We are required to raise a substance. You didn't anticipate them before. You actually got into the charge conference, and at the charge conference, even though you had written a request for an instruction on official act, you changed that, added the McDonnell approach in the charge conference. So it was not anticipated well in advance. It came right in the charge conference? It came in the charge conference. We tendered it, and the court refused it, and the court said that, you know, it gave an instruction that said, any action to be taken under color of official authority was sufficient to be an official act, and that was the Second Circuit law at the time under Rosen. The court's instruction wasn't, you know, wasn't completely out of bounds in that sense. It wasn't consistent with what the law now is under McDonnell. The definition that was given by the district court is too broad. McDonnell says you cannot instruct that way. Now, McDonnell changed the law dramatically. Can I ask you a question about official act? Sure. The instruction that the judge gave here, there was an instruction essentially that there had to be proof of an official act within the statute of limitations period. In other words, some act had to happen during that period of time, which satisfied the definition of official act. Obviously, the government suggests that that's not necessary at all, but the government did not object to that instruction. Is that what happened here? In fact, the court required that there be proof of an official act within the statute of limitations period, and nobody objected to that? That is correct. The instruction was given. We attended a slightly different instruction, and the court mentions that in a footnote in its bail motion, but the order on the bail motion, excuse me. But there is a statute of limitations instruction that was given that said that no aspect of the scheme, that there wouldn't be a finding of any crime if there was no aspect of the particular scheme that had occurred prior to February 19th of 2010. Okay. So there's a statute of limitations. You've got an offense here, and you've got an offense which obviously starts theoretically in 2003 or at least 2005, and then according to the government theory, it approaches the statute of limitations and then goes into the following years. But, you know, it's unique that in fact there would be a requirement that there be an official act proven within the five-year period in regard to the way normal continuing offenses occur. Not here, Judge Sessions, and let me tell you why. Let me tell you why. Because when you look at the asbestos scheme, which is the or asbestos charges, excuse me, which is the charge that this relates to, the allegations and the evidence was that in 2005 and 2006, there were two state grants through the Department of Health, and we can go through the evidence as to whether or not there was a quid pro quo proven, but that's not the point, but those 2005 and 2006 grants were made. And in 2007, all right, the government's witness testified that Mr. Silver came and saw him and said, I can't do this anymore. That was the language, 2007. And the court acknowledged, the district court acknowledged in her order on the bail motion that's at the appendix of A1100 that the evidence that there might have been things that had continued after that, that it's conceivable that a rational jury would not have convicted if it had received complete instructions on both what constitutes an official act and specifically must have found that it occurred within the statute of limitations. So I understand that's the government's position. The district court doesn't even agree with the government on that point. Now, I was just going to say, so on the issue of statute of limitations and the issue of official acts, the passage, if you accept, you know, the government's theory that these grants were made, all right, in exchange for the referrals that were made, those occur clearly outside the statute of limitations. So what are you left with then on the asbestos charge? And what is it exactly that occurred after the statute of limitations? So this is what occurred on the asbestos charges, to be honest. We have the doctor's daughter getting an unpaid internship. That actually occurs in 2007. The judge never speaks with Mr. Silver. She's been hired, the judge says, based upon her impressive resume and her personable demeanor. There's no formal exercise of governmental power. Then we have the son's job, the son's low-level job for the social services agency, OHEL. That occurs in 2012. The executive director of OHEL testified that there was nothing unusual about this request. He would have given the same consideration to candidates that came to him that were requested by friends, neighbors, other community members. The government did not elicit one word suggesting that there was some pressure, some threat, that there would be a cutoff of any kind of state grant if, in fact, this job was not given. The son held two Ivy League degrees and had experience that was relevant in internships that related to this. There is no formal exercise of government power there. That is not an official act. Then we have the meeting of the charity. It's not tied to a member item or any kind of grant that comes out of the then speaker's personal determination with regard to member items that then went to them. OHEL did receive state grants. Mr. Silver was one of many people, many members that were involved in sponsoring those grants, but there was no suggestion of any discussion about the grants. And McDonald's says that there's got to be pressure. It can't be, you know, somebody says, well, maybe this may happen. And, by the way, if, in fact, there was any suggestion that OHEL felt pressured or OHEL felt that their grant would be cut off, you can bet that the prosecution would have elicited that testimony, and there was no testimony. So that's the record. We're going through these, and I think it's important that we go through these. But I want to interject just for a second. But there was a point in time, sometime within the five-year statute, where there was testimony from the government's witness that Mr. Silver complained about the diminishing number of referrals that he was getting, which was causing subsequent commensurate reduction in its referral fees at White's and Luxembourg, right? There is testimony that he has a conversation with the doctor about, you know, are there going to be more cases. So there's that conversation. And then go on. What are the other reasons? By the way, getting cases from Dr. Tao is not illegal. And, again, it must be in exchange for an official act. Well, the whole issue as to whether it was or wasn't property or whether it satisfied the quid and the quid pro quo, et cetera, is another matter. But let's just stick with the timing thing. Because I don't want to alter, judge the focus that the senator asked her to do. So then what are the remaining acts? So the remaining acts are there was the meeting on the charity Miles for Me So Walk that is going to occur in Lower Manhattan. And Mr. Silver meets with Dr. Tao and a lawyer from another law firm. His office writes a letter after this meeting offering to help, quote, navigate the process. There is no formal exercise of power. Again, McDonald's says that merely meeting is not enough. And there's no evidence of any pressure. The walk never even takes place. So this is a one-meeting situation. There's a letter after the fact. And no official action. No formal exercise of governmental power. Then we have the last is there was the American Cancer Society resolution and proclamation where Mr. Silver arranged for Dr. Tao and two other health care workers who were being honored by the American Cancer Society to receive a plaque from the assembly, which was done by a voice vote. Mr. Silver was not there. There's actually a videotape of this vote in the record. And you see that the members are joking around at the same time that this plaque is done. And your point is it's not an official act? Well, our point is that we agree with the district court that this was pro forma and a rubber stamp. Taking the literal definition of official act being this is something that's passed by the assembly, you would say it's an official act. But the judge raised the question, you know, could the government can't establish, again, their burden here is to establish beyond a reasonable doubt that this was a quid pro quo and not some courtesy. And, you know, who would, and Dr. Tao didn't say that there was any kind of a quid pro quo in exchange for this. I agree with you. I mean, these are common, that's true. Legislative resolutions are common. It's one of the few things that minority assemblymen and women get passed in the state assembly. But you would agree that notwithstanding that, that it may seem to some as trivial, that if someone were saying to a certain person, you know, I can get a resolution passed for you, honoring you for your great contributions to the volunteer fire department of West Bloomfield, New York, but you've got to give me 50 bucks, that would be a quid pro quo, would it not? Because, I mean, you would agree with me that this bears the official, this is 8676, this bears the stamp of the assembly. It appears as a formal document. It's passed during the proceedings of the legislature. It's passed on a voice vote, albeit a voice vote, that's not illegal and done all the time in the legislature, and that if someone were selling these, that would be a quid pro quo. You would agree with me on that. I would agree with you on that. But what the district court said, and which is true, is that a rational jury, a rational jury could well have concluded that there was no quid pro quo here. Remember where we are in this proceeding at this point in time. We're talking harmlessness now. No, no, we're not talking about that. Wait a second. We're talking about harmlessness in the context of the conduct that appears within the statute of limitations that then signals whether there was or was not a continuing opportunity for a relationship between the government's witness, Dr. Taub, and Ben Spiegel. Correct. The government's burden now is to establish beyond a reasonable doubt, it's their burden, to establish beyond a reasonable doubt that a rational jury would have convicted Mr. Silver if properly instructed. So using the example of — We have to see that event as an earmark of the continuing relationship and a series of opportunities to curry favor. Or the new relationship. But the point being that they must prove beyond a reasonable doubt that a rational jury would have convicted, all right, based on that. And they can't do that. And the reason, one of the reasons they can't do that is that the government made, and this gets back to your point earlier, Judge Sessions, about McDonnell and when it was pending. The government made a strategic call here, all right. They decided they weren't going to ask for a special verdict for him. So we do not know what acts the jury found were official. We don't know which acts they found, if they were official, for which there was a quid pro quo. They threw everything up against the wall. When you look at the indictment and you'll see the treatment that's given to these acts. In their closing, didn't they say, in their summation, didn't they say it could be anyone? This is what they said. Each one of these is an official action. Each one, by itself, would be enough for you to convict. It threw everything up against the wall, and that's what we're left with now. And it was a strategic choice. It was a strategic decision. Let me just make sure that I understand the point, because we're talking about official acts after or within the statutory period. But they're not official. You've only got three official acts which are possible. So number one is the son. Obviously, what you're suggesting, I think, and number two you object to as well, what you're suggesting is there's no way to be able to figure out whether the jury relied upon the son getting a position with a private organization, because, of course, it was an act by Mr. Silver but does not necessarily satisfy government. So you don't know. You have to extrapolate from other facts. But you don't know whether the jury relied upon that particular assertion to establish governmental acts as opposed to others. That's absolutely correct. They threw it all against the wall and hoped that something would stick. But you would acknowledge, would you not, that the charity determination, whether it's significant or not, maybe no jury would ever decide that this is a governmental act sufficient to justify a conviction. But you would acknowledge that that is, in fact, a governmental act. Which act, Justice Sessions? This is the award to Dr. Tall. The state grants that occur in 2005 and 2006? No, no, this is the award ceremony. Oh, that award, the resolution. On the resolution, yes. You would agree that that's a governmental act. Yes. But Judge Caproni herself said, you know, it's very possible that a rational jury would never conclude that this was a quid pro quo. And, again, it's the government's burden to prove beyond a reasonable doubt that that's what occurred. The Senate chair's indulgence. Could we ask a few more questions on the real estate side of this? Yes, let's move to the real estate. I'll go on to the real estate. On the real estate side, in her order denying the Rule 29 motion, Judge Caproni said the most compelling evidence, the most compelling evidence on which the jury could have relied in convicting was the evidence of a meeting between the Glenwood lobbyists and Mr. Silver before the act ever comes to the floor, all right? Before the renewal of the 421. Before the renewal. So it's the meeting, all right? But isn't that meeting with Mystic Glenwood, isn't that right before the Wren Act of 2011 gets adopted and applied? And wasn't that the subject matter of the discussion? And to some extent, cannot you fuse those particular concepts, that's the meeting, and then the following of the passage of the law into essentially a governmental act? No, because, Judge Sessions, the government pled them separately and they argued in the argument, in the summation, they got up and said that that meeting, ladies and gentlemen, that's official action, specifically calling out the meeting as a special individual act, it's the way it was pled, it's the way they tried it. And they touted this essentially as special access by well-heeled donors. A separate issue that we raised is, you know, the fact that they introduced the political contribution evidence, which should not have come in, but that played right into the hand here. And McDonald's specifically holds, it expressly holds, that a meeting is not enough. I tried the case, and I can only imagine had I been able to stand before the jury and say, they said that meeting, ladies and gentlemen, that's official action. Had I been able to say, no, it's not, because the law says that a meeting in and of itself is not official action. It's got to have the formal exercise of governmental power. But during the course of the meeting, if during the course of the meeting it was made evident that the bill would not pass unless they were satisfied, the meeting would be a portion of leading up to an official act, since the speaker would be, the theory of the government was the speaker controlled what went to the floor of the assembly. And so, therefore, that meeting would be part of leading up to the official act, ensuring that the statute was in compliance with what Glenwood and the others wanted, right? Well, first of all, it was. I mean, you just can't separate the meeting out and say it exists by itself. The meeting exists in the context of the fact that the statute is about to be reenacted. There's a sunset provision. They did separate it out. That's the point. I mean, maybe one could. Okay. Separate it out. I'm interested, and that's the point that you make, that the meeting is different than the subsequent passage of the statute. Correct. They're charged separately. Where did they plead it differently? In the indictment, they're shown as separate acts, and they argued them as separate acts. Okay. I want to be clear about this. Yes. I don't feel like I picked it up. You know, there's a lot of briefing here, a lot of stuff to think about. So your position, I'm anxious to hear from the government on this, your position is that their position at trial, what they argued to the jury, what they sought to obtain a conviction on, was the meeting alone. Right. Okay. And just to bolster that and make sure it's clear, just to make clear. It's okay for you to bolster. Okay. Thank you. Judge Caproni recognized that. When you look at her order granting the bail, pending the appeal, she says that meeting, okay, and in the argument, the quote that I was reading from, the prosecutor gets up and says, that meeting, ladies and gentlemen, that's official action. Not talking about the passage of the record. And you're reading from what page of the record? It's from, I will tell you. On your rebuttal time. I will tell you. Now, I also want to point out, too, that the Rent Act itself, by the way, the testimony from Glenwood, all right, was that the extension of the 421A tax was not all that controversial, that the lobbyists. Was the vote on the Rent Act in the record? Was it what? I'm sorry. I believe it's in the record. Vote on the Rent Act. I believe it's in the record, and I can't tell you exactly what it is, but I suspect it followed party lines pretty closely. And the lobbyists testified they never asked Mr. Silver for anything or got anything. And, you know, one of the oddest things about this case was that the lobbyists didn't know that Mr. Silver was getting any referral fee from Goldberg until after the act passed. All of the commotion around the fact that this referral fee was being paid by Goldberg occurs in 2012, early 2012. And so it's a very odd bribe scheme where the person. The record is at A609. Thank you very much. I'm sorry, 608 and A609. Thank you. Can I just go just beyond that particular question? That's the meeting. So in light of your arguments on asbestos in which there are three different options and who knows whether the jury decided that the official act was proven by one act as opposed to another. So aside from the meeting, are there other potential ways in which the government could approve the official act, which don't necessarily meet the new McConnell definition in these real estate transactions? In addition to the meeting, there was the opposition to the methadone clinic, which occurs downtown. There was a Glenwood building. And next to the building, there was going to be a methadone clinic. Was that actually charged? Because I know that your argument was that Mr. Silver very early on said that he was opposed to the methadone clinic being located right next to Glenwood. But was that a part of the arguments that the government was going to use to be able to show official act within the five-year period? Yes, they argued it as a separate official act. According to the government, they kept talking about Mr. Silver springing into action to help Glenwood. And the lobbyists testified that he was told, to your point, that Mr. Silver was already addressing this issue. The government introduced this draft letter. There was no evidence of Mr. Silver, none in the record, of him going out and talking to anybody about anything. No advice, advocacy, pressure. There was no formal exercise of governmental power as required under McDonnell. The letter was offered to prove that he had interceded? The letter was offered. It was a draft letter that was offered to prove that he sprang into action, right. But there was no evidence of him actually doing anything in the record. There's none. And then the last act under the real estate, we've talked about the legislation, the meeting, and the methadone clinic, are these PACB bond approvals. And that action, the activity, just as, Wesley, you were asking about, you know, the resolution, isn't that really, you know, a formal government action? The actions. Surely those are government actions. Sure, they're government actions. But the question is, is it an official act by Mr. Silver? The answer to that is. How can they not be official acts? By Mr. Silver, because, first of all, there was no evidence that the board ever rejected any bond deal of Glenwood. The government has a false statement in their brief that I want to just call out. They say that Mr. Silver never voted against Glenwood on these deals, or always voted for them. Mr. Silver never cast any votes. He had someone who he nominated who sat on this board, and there's a difference. And the government's witness. Why is there a difference? Because the government's witness testified. The only evidence, we're confined to the record that's here. The only evidence that the government put on, the government's witness testified that they had no knowledge of Mr. Silver ever having any conversation, any discussion with this nominee on the board about any votes, let alone Glenwood votes. The nominee didn't testify. Is it fair to say? Correct. There's another person. What your argument is that there's no evidence of coercion by Mr. Silver to this nominee to vote on behalf of the Glenwood request for bonding. Correct. And that was the choice that they made in trying their case. They didn't call the nominee. They called this person who then gave the testimony. This was somebody who was supposed to be knowledgeable. Who were those votes? How were those votes shown or proven? There were certificates or documents that showed that the votes. The minutes of the meeting. They were admitted. And there were a series of them. But as I say, there was never any evidence that these were never rejected. These were, the district court acknowledged, again, when you re-judge Caproni's opinion granting. Even if they weren't rejected, if there were, if Mr. Silver had gone to Glenwood, this is a what-if step. If he had gone to Glenwood and said, look, I'm going to cause trouble. I'm going to raise hell about this one and cause you some difficulty unless you continue to send your tax-society proceedings over to Jay Goldberg's law firm. Even though it might not seem as a terrible threat because these things are always passing. And he's got a terrific interest in having them pass because he's a very, his district is heavily tenant-occupied. And these are pro-tenant, end up being pro-tenant. They're pro-landlord. Even though it doesn't seem like a terrible threat, it still could be a quid pro quo, couldn't it? I suppose there could be a set of facts where that. The difference is that the governor had not a nominee. He had a person who actually exercised the judgment. That was the budget director. And for some reason, the majority leader, or the president pro tem designated Senator DeFrancisco from Syracuse, who was the majority leader, I guess, at that time. And then, but the speaker himself used a proxy. It wasn't a proxy. It was a designate. Supplemental Appendix 595, the word proxy appears repeatedly from the witness. That's Putnam on direct. But the point being that that suggests that there was some direction by Mr. Syracuse. Well, a proxy votes the whim of the person to whom the proxy is given. But there was no. He was a representative. Representative. There was no evidence, okay, none. And, in fact, the only evidence that was offered suggests that there was never any conversation. Another word for representative might be agent. It could be an agent. But the point is, was there pressure exerted? And there's no evidence of that. And that's what McDonnell requires. Again, I just look. The law changed. The judge followed what Rosen said at the time and gave an instruction, you know, that was extraordinarily broad. The instruction, you know, was that if, in fact, Mr. Silver, you know, it would lead the jury to conclude that these incidental political courtesies that people in the assembly do and other government officials do all the time, the definition was any action taken or threatened to be taken under color of official authority. That is too broad under McDonnell. Let's wrap up here. You're giving me lots of time, but let me ask you a question, a kind of procedural question. You ask us, and I quote from your conclusion, that we should reverse Mr. Silver's convictions or at a minimum vacate and remand for a new trial.  Which of these counts on your theory would be reversible? Which of these convictions? All of them. All of them, and I'll explain briefly why. First, on the extortion charges, the Hobbs Act charges, the government failed to prove a deprivation of property. If you look at the definition of extortion, there's nothing about deprivation of property. You took something from Sec Bar, as I could determine, and it's sort of a loose use of language. It's not only deprivation, but you have to show loss, essentially. And I'm not so sure that they were suggesting that deprivation was necessarily an element of the offense, because, in fact, extortion never said anything about it. Well, actually, when you look at Sec Bar, it mentions the Scheider v. Now case, which talks about going back to New York penal law, and New York penal law specifically talks about both that there has to be an acquisition of property and a deprivation of property. Now, Sec Bar involved, the primary issue there was whether or not there was an acquisition of property, but it stated the law that you must have both. And there was no deprivation of property here. Dr. Taub on the patient side made recommendations not just of Mr. Silver, but to other lawyers at Weitz and Luxembourg and other law firms. And once he made that recommendation, he was free to continue making that recommendation. He was never deprived of anything. The government never even argued that there was a diminished value because a referral had been made. And on the real estate side, they argued that the referral fees that the developers were deprived of property because they sent tax or cheriori work to Goldberg, they got value for that work, and they would have had to send that work to someone else had they not sent it to Goldberg. So that deals with the extortion charge. On the honest services charge, the government failed to prove what the Skilling case calls a paradigmatic bribe scheme for an honest services fraud conviction. Now, whether or not the conduct, someone might find it objectionable, whether or not it might violate some other law, not the issue. The issue is honest services fraud. Skilling had a situation, as you recall, where the CEO, the charge essentially that was relevant was that the CEO made a lot of money because his lies or directed lies about the company's financial situation bolstered the value of the company, and that he received the benefit of that by having stock and other compensation that was based on the company's false poor performance. Here, you know, what we have is Mr. Silver receiving legal fees that were paid at a standard rate. They were a standard percentage that would be paid to any lawyer at these firms. They were paid based upon successful outcomes for these patients and the clients and for value rendered. There was no allegation that there was a sham or that they were inflated. It's not the illicit type of payment that classically is considered a bribe. So when those two fall, then the money laundering charge falls as well. I just want to point out. We've heard you. Okay. You've reserved some time. Thank you very much. A lot of extra time. Go ahead. Good afternoon, Your Honors. May it please the Court. My name is Andrew Goldstein. I'm an assistant United States attorney for the Southern District of New York. I'm representing the government on this appeal, and I was one of the assistant U.S. attorneys who represented the government at trial. The evidence at trial in this case overwhelmingly established that Sheldon Silver abused the immense power that he had as the Speaker of the Assembly to engage in these two long-running schemes that have been the discussion of the argument thus far. And in each scheme, he traded clear official action, grants, and legislation in order to benefit the people who were paying him, and that he furthered those schemes through lies over a number of years. And so this case, as the district court noted, was nothing like the McDonald case, both in terms of the jury instructions that were given and the uncontested proof at trial. This case was about far more than mere introductions and meetings and nothing more, which is the problem of McDonald. Here, as the court required and the jury found, Sheldon Silver engaged in official decision-making as the opportunities arose, in order again and again and again for each scheme over a decade's period of time to benefit those who were paying him. And so in that context, the argument that is being made by the defense now is to selectively pick one or two or a handful of actions that were unquestionably part of the schemes, both on the real estate side and on the mesothelioma side, and to say that those now, after McDonald, are not official action. But that's beside the point. They do have to be official actions, don't they? I mean, the grants to Columbia, the hospital, the $250,000 grants under the HCRA, those are classic examples. So you get a referral fee for, I'll send you potential plaintiffs and mesothelioma claims if you'll give them some money to where I work to help me with my research. But those are over five years old. But the remaining conduct, which all three of us have focused on, which falls within it, is a little bit different. And do those have to be official acts, or can they just be indices of the scheme to allow the jury to have convicted on the acts? And didn't you argue to the jury that they were official acts and that they could have convicted on any of them? They can be just indices of the scheme, Your Honor. And to clarify something that I think was mistaken in the question. But you did argue to the jury that they could convict on any of them. We argued that each one by itself was enough for you to convict. And in making that argument, the point of that was to emphasize that at every turn, throughout the decade-long scheme on the mesothelioma side, at every turn, Sheldon Silver would do things for Dr. Towne for a price. And each one of the acts was a use of Sheldon Silver's power. And the government also made clear after that, in the paragraph that followed, that all of the acts were undisputed and that this was an as-opportunities-arose scheme. And so the question for the jury, and the government put this very clearly both in its main summation and in rebuttal, the question for the jury was, since all of these acts were undisputed, why did Sheldon Silver over this long period of time take act after act after act for the benefit of Dr. Towne? Let me stop you for a second and ask you about the referral of his son to a state Supreme Court justice. McDonald talks about the fact that in public life, public officials do things to assist their constituents. Many members of the Assembly and of the Senate pride themselves on their constituent services, many of which include recommending children of people that they know. They may know them because they're a committee woman on the Republican or Democratic committee. They might know them because they're a frequent attender of one of their campaign events where they raise money. They know them. And there's a son or daughter who wants to go to college, and they write a letter of recommendation. Is the fact that they've written a letter of recommendation an unofficial act? Not in every circumstance, Your Honor. Well, then how does one decide whether it is or isn't? The facts of this case are a little bit different than that. The government understands and accepts that a routine political courtesy. Well, let's talk about the referral to Judge Schoenfeld. Did Judge Schoenfeld say that Speaker Silver called him and said, you have to hire this guy or I'm going to cause trouble for you? He did not testify. Did anyone from Speaker Silver's office call and say that you have to do something? They did not. Did the record show in any way, shape, or form that Speaker Silver had any control over what the judge did or didn't do? The judge is an elected official. Was he threatened with not being endorsed again? I don't know what judicial district he ran in. Was there any of that? So this is the letter that bears the signature Shelly Silver, Sheldon Silver. It is a little bit more than that, Your Honor. And to step back. Is it because Sheldon Silver was a powerful person and so therefore Silver shouldn't be fooled? The evidence for this particular act, which took place in 2007, and the government, the court does not need to reach. Well, then let's put Judge Schoenfeld aside and let's go on to the hiring of the son, because that was the daughter, the hiring of the son by the charity, the agency that received some public grants. Was there something that showed that Silver had any way indicated that those grants would not continue? Well, in some respects, yes. The timing of the request was so, and Your Honor, to ask the defense as to whether or not there was some member item that was tied. The evidence at trial was that Sheldon Silver was by far the biggest official benefactor of the charity of OHEL. He directed more than $6 million of state grants at his own discretion to OHEL. In March of 2012, he directed a $2 million grant to OHEL. In May, Sheldon Silver gets a phone call from Dr. Taub, and Dr. Taub asks him again about getting his son a job. And the next day, Sheldon Silver reaches out to the executive director at OHEL and sends a letter to the executive director, asks about inquiring about his resume, and asks to get a report on progress. So the next day, after he gets one of these leads that ends up being worth $170,000, he makes this phone call, and it's within the context of choosing this particular organization. And the government's view is that this is not any different than the Supreme Court's Ocasio case, which was decided in the same term as McDonnell, where police officers used their influence to direct accident victims to vendors that were paying them. Here, it doesn't matter whether or not there was a threat that was explicit. Without question, Sheldon Silver had influence over OHEL. David Mandel, the executive director, testified that one of the reasons that he got personally involved in the hiring of Jonathan Taub was because Sheldon Silver was such a friend of OHEL. And so what happened here was the use of the speaker's official position in order to influence a private actor to help the person paying him. That's the distinction. Initially, you went to trial on the official position, and that is what you basically argued, was that anything that Mr. Silver did in connection with his role as Speaker of the Assembly was an official act. I mean, that's basically what you argued. And so as a result, what you're suggesting is that even writing a letter to get somebody referred to a particular position is an official act. That's something totally different, is it not, from now this governmental act that's required as a result of McDonnell. And so how does this particular letter translate to this new world, which is essentially a governmental act? That's the first thing. And second, how do you know if the jury knew the correct definition of governmental act or official act, which is governmental act, how do you know they would have made the same decision if, in fact, they had relied upon that particular scenario to establish official act within the five-year statutory limitations period? There are three ways, Your Honor, and to begin with, I just want to correct a misimpression. The jury's — You think I was wrong? Oh, no, I'm sorry. The Court's instruction about statutory limitations, which was requested by the defense, not objected to, and is not challenged here, is at page 899 of the special appendix. And the instruction was not that an official act had to happen within the limitations period. The instruction was that if you find that no aspect of the particular scheme you're considering continued in the limitations period, then you must acquit on that scheme. And that jury instruction was not objected to by the defense, and the defense could have argued, regardless of McDonnell, that the mesothelioma scheme did not continue past 2010. And they did not, and they chose not to because it was so obvious that it did, that in every respect, regardless of whether any of the acts that are being challenged now are deemed official under McDonnell, the scheme continued. Do you acknowledge that there has to be proof of a governmental act under the definition of McConnell, McDonnell, within the five-year period as a result of the instruction that was made by the Court at trial? Do you acknowledge that you have to prove at least one of them to be a governmental act? We did so prove, but you did not have to prove that, because all we had to prove, in accordance with existing case law, and the defense has never challenged this, is that any aspect of the scheme. And here, the quid kept coming. The Speaker, regardless of whether or not there are official actions under McDonnell, the Speaker kept using his power on Dr. Tao's behalf. The Speaker continued to lie about the scheme and the sources of the money that he was getting, wires and mailings were sent in furtherance of the scheme. And so there is no, there is absolutely no question that the scheme that started indisputably based on the grants, which were clear, unequivocal official action, and was the basis for the scheme, it was what Dr. Tao testified was the whole purpose of the origination of the scheme and why he continued to send leaves to Sheldon Silver. That continued well past 2010. I really appreciate them. You've got a meeting between Mr. Silver and Dr. Tao within the five-year period. That clearly suggests that there's an extension of your theory from pre-statute limitations as a continuing defense into the current. That's correct, Your Honor. The question, it seems to me, is, number one, how do you prove that a governmental act happened within the five-year period, because that was the instruction to the jury, and second, in our particular role, how do you try to figure out what governmental act the jury relied upon in satisfying that element, or is it merely speculation that they picked one as opposed to another, one of the charged governmental acts that you have asserted? Again, Your Honor, there's no need for the Court to speculate at all because all that the Court has to find is that the scheme, that any aspect of the scheme continued, regardless of whether or not any of the post-2010 actions count as official actions. But what were those aspects after February 19, 2010? In May of 2010, Sheldon Silver arrives unannounced at Dr. Tao's office and points out that he is not receiving as many referrals as he had before, and the implication that Dr. Tao had was that he wants more. And Dr. Tao testified, and that's at transcript 340 and 378, that the reason he then continued to give Sheldon Silver leads was so that as an opportunity arose for Sheldon Silver to give state funding again, Sheldon Silver would do so. But it didn't happen, right? That's correct, Your Honor. But Sheldon Silver found other ways to use his power. And so the next thing that happened within a week— What were those other ways? Then that same year, in 2010, is when Sheldon Silver knows that there's going to be this charity event that is going to honor Dr. Tao and is being sponsored by the law firm, the Simmons firm, that was his now competitor. Because Dr. Tao told him that he was now sending his leads to the Simmons firm because Simmons was funding his research. And Sheldon Silver, upon hearing that news, rushes his staff, ten members of his staff, to put together this resolution. And it may be something that happens a lot. Ten members? Ten members of his staff were required to work on this resolution and this proclamation to be rushed out so that Sheldon Silver could effectively horn in on the event that was already scheduled so that he could present this award to Dr. Tao. It doesn't matter if Dr. Tao didn't think that he was exchanging leads to get the resolution. What mattered is that there's no question that the reason Sheldon Silver ordered up that resolution on a rush basis and got his staff to do it was because he wanted to continue to get more leads from Sheldon Silver. Your opponent conceded that this seems, I mean, a perspective of 35 years ago sometimes clouds the view of the world. But he's conceded, and I think rightfully so, that this may seem like a silly official act, but it is an official act. But I take it you say even if it weren't, it doesn't matter because it's an indices of the continuation of this scheme that as opportunities present themselves, as long as the scheme's waiting for another opportunity, the conduct of the scheme remains before the court regardless of its timing, as long as it's a continuous scheme. That reminds me, in a way, like conspiracy. I think of conspiracy theories. There's someone who is going to repudiate the conspiracy, has to do so in clear and unequivocal language. We're not here or there, but it's a similar theory in the sense that unless there's something that really shows an end to it, things that indicate its continued existence can be used by a finder of fact to ultimately assess criminal liability for something that may have occurred outside of the statute of limitations. That's exactly right, Your Honor. And again, that is— And your best case for that is? That every aspect of the scheme— No, your best case for that. Are there a lot of cases? I mean, I've read all these briefs and the preparation occurs at various times, and then we distill this down into what we need to find out from you. But in your view, your brief supports that strongly. It does, Your Honor. All right, fair enough. I'm not going to take your time with that. Go ahead. Let me go back to the chronology. You spoke of Silver directing public money to OHEL at a certain point. I think you said March 2012. Is that right? That's correct, Your Honor. It was in February 2012, which was a month before, that they helped Silver help Topsun get a job with OHEL, right? That's actually not right. So in February of 2012 is when Sheldon Silver first reaches out to OHEL and to the executive director of OHEL and asks if they can get Jonathan Taub a job. But then—sorry, I apologize, Your Honor. That's when Dr. Taub first asked Sheldon Silver for his help in getting his son a job. So that happens in February. Sheldon Silver did not act on that right away. And that is also consistent with the other evidence in the scheme, that when Dr. Taub would make a request, Sheldon Silver often did not act until he was paid in these leads. And then in March of 2012 is when the $2 million grant gets finally approved by Sheldon Silver to go to OHEL. And then in May of 2012, there's another phone call between Dr. Taub and Sheldon Silver where he gives Sheldon Silver a lead on May 17th. And then on May 18th, Sheldon Silver then reaches out to the executive director of OHEL and asks him if he can find a job for Dr. Taub's son. When was that? That was May 18th, 2012. Let me just go back to, you know, your assertion that the governmental act about honoring Dr. Taub clearly satisfies McConnell or McDonald. So you've still got three allegations of governmental acts, including the charity event, including the hiring of the son, and honoring Dr. Taub. So you got an instruction to the jury, you have to find one of these official acts during the five-year period. That's what you instructed the jury. Judge Sessions, that's actually not how the jury understood it. Clarify that for me again. So, again, this is at 899 of the Special Appendix. But the judge's instruction was if you find that no aspect of the particular scheme you were considering extended into the limitations period, then you must acquit on that scheme. But the word was aspect. The judge did not require, and it's because there would be no case law to support, the judge did not require an official action to be found into the limitations period. And so where we are here is every one of the acts that Sheldon Silver took after 2010, there were serious uses of his power, but the Court does not need to find or make a decision to reach the issue on those acts. At a minimum, each one is absolute evidence of the continuation of the scheme, is part of the scheme, and shows that the scheme continued well into 2014. And so whether or not, so there's no need for the Court to make some decision as to would the jury have found this an official act or that an official act. The scheme was based on the grants. That's what Dr. Taub testified about. That was the overwhelming thrust of the government's evidence. That was the principal theory of the case. That scheme continued indisputably into the limitations period. And that's all the Court needs to resolve. Indeed, the charge indicated that that could occur, and that specific charge was unobjective to it. That is correct, Your Honor. That is correct. Okay. With respect to the, if I can, if there are no questions about mesothelioma, I would like to turn to the real estate scheme. Yes, please do that. On the real estate scheme, in the same way that the grants were the principal theory, the heart of the mesothelioma scheme, the legislation that Glenwood wanted and needed was the heart and the thrust of all the government's arguments on the real estate side. The evidence was that Glenwood management was a one-trick pony. They had luxury, high-rise rentals, and they were incredibly dependent on a particular legislative program, this 421A program. And Sheldon Silver knew that. And the testimony was that over the course of a long period of time, starting in 1997, when the real estate legislation, including this tax exemption program, first came up, is when Sheldon Silver went to Glenwood and asked them to move their tax certiorari business to Jay Goldberg, who was then going to pay him a portion of the fees. That year, Glenwood agreed, and then in 2003, the 421A legislation was renewed again, and the next year, Glenwood doubled the business that it was sending to Sheldon Silver via the Goldberg firm. In 2007, the legislation was renewed again, and then that year, Glenwood sent ten more buildings to Sheldon Silver via the real estate law firm. And then in 2011, after the Rent Act of 2011 was passed, and there was an agreement that was kept secret from the world between Glenwood and Sheldon Silver, Glenwood directed another six properties to Sheldon Silver. But during the first portion of that relationship, Glenwood did not know that Silver was benefiting by the business that they were doing with Goldberg and his law firm, did they? That's correct, but they knew that you wanted it. Well, what kind of scheme is that? I mean, you know, they send it there, and because Silver says, I'd like you to do that, I mean, Silver suggested it, right? Silver suggests that they do that. How is that? You're saying that's enough? It would be enough. Again, the court doesn't need to reach that, because in late 2011, early 2012, when the principals of Glenwood were made aware that Sheldon Silver had been receiving hundreds of thousands of dollars from Glenwood, that they then decided, despite the enormous problem that they knew that this was going to cause, they decided that they had no choice but to continue to retain Sheldon Silver. I get that. That's the easier to understand in terms of the quid pro quo and getting payments from a third party that are newer to your benefit. So the quid side is through another party, and there have been a number of cases about that in the legislature, unfortunately. But what I don't understand is if they didn't know at the beginning, would that still, I mean, is the fact that they would want him to be happy about it because, I mean, he asked them to do that, but there's nothing that indicates to them that he benefits by it anyway other than the good feeling that somehow he's sent business to this law firm. I don't get what the value is. I don't understand the relationship, if he doesn't know it. The jury was, the question for the jury was Sheldon Silver's intent and not Glenwood's intent, and at a minimum, Sheldon Silver, at his request, asked Glenwood to move the business over, and they knew at a minimum this is somebody who had not just enormous power. Sheldon Silver had the ability to end Glenwood's business, and so they did what Sheldon Silver wanted. They didn't want to alienate him, the testimony in 2012. Any powerful person who asks someone to do something is committing a crime, a federal crime, because people are afraid of powerful people and they want to curry their favor? Not in every case, Your Honor. Is every invitation to a fundraiser a threat? Absolutely not, Your Honor. But we have to draw some lines here. I have to understand, I don't understand. The simple fact that he's a powerful person doesn't mean that any time he asks somebody to do something that he's committing a crime, does it? Absolutely not, Your Honor, but there are additional factors. I mean, what if he said, I like Jake Goldberg, he used to work for me, he's a good guy, and he's a good lawyer. If you get a chance, send him a couple of cases. Is that a crime? The crime is whether or not Sheldon Silver himself is influenced in his official actions. And so if all he does is make the request that you just said and nothing more, then that would be different. You seem to imply that because he is so awesomely powerful, or was, that inherent within that then is the fact that he could do something about it if you didn't, and so therefore you have to do it. Am I missing anything? I think you are, Your Honor, in that here, what Glenwood wanted and needed from Sheldon Silver was a very specific thing, a specific piece of legislation that got renewed on generally a four-year basis. Yeah, I suspect without a lot of debate, other than from some of the people from upstate who don't understand the role. The testimony actually is that that is not true, that the real estate legislation each year, the package of things that were being played with each year, that that legislation was hotly contested. It was not something that was easily passed because you had the Democrats generally pushing for tenant protections, you had Republicans pushing for... All 48 of them. The loss of 150. The point here is looking at Sheldon Silver, was Sheldon Silver influenced? He was receiving hundreds of thousands of dollars from Glenwood, and he knew it, and he knew that he was getting it through this Goldberg firm, and so each time, and it is a fair inference for the jury, that each time he approves the 421A legislation and makes sure that that gets through, and that he then gets a bonus from Glenwood in additional buildings, that he is influenced, that he knows not to bite the hand that feeds him. And then in 2012, they know, and the testimony was very vivid at trial. Richard Runas, the chief lobbyist at Glenwood, said that when they knew, they had the tiger by the tail because they could either hold on to it and keep paying Sheldon Silver or let it go and let the tiger go and risk their whole business. And they wanted to make an enemy out of Sheldon Silver, and so they decided to keep paying him and to do it in a way that was totally secret, to sign a side letter that they kept off of their own books. And again, why did they do that? The whole point of the testimony at trial, they did that because they knew that when the legislation came up again in 2015, they needed to make sure that Sheldon Silver was not going to ruin their business. And the reason why I raise all of this is because in the context of that scheme, that more-than-decade-long scheme, this single reference to the meeting in June of 2011 was not the basis for the jury's verdict. And the reference to the meeting, that meeting... I mean, basically, in the summation, I mean, getting to official act or governmental act, forgetting the timing that it has to be within five years, that's a totally separate issue. You have to prove official act, governmental act under McDonnell. And, McDonnell, you basically made various arguments, page 608 or 601 of your summation, in which you list all of the things that the jury could consider in making the determination. All you have to find is that they met. That was sufficient. Or all you have to find is that he made an effort to get his son to work with O'Hill or et cetera. You list them all in your summation. You make this statement that this is how you can prove official act, and who knows whether the jury made a determination of official act based upon what you represented there or based upon your much broader scheme. I mean, how do you respond to that? The way you know it, you know this in a few ways, Judge Sessions. Number one, even if the judge did not use the actual language of McDonnell, the judge required the jury to find that Sheldon Thoreau was influenced in his official decision-making or that he exercised official influence. And there was also a generalized goodwill instruction, which was not provided in the McDonnell case. And the generalized goodwill instruction also helped ensure that there was a difference between simply getting access and paying for access or paying for actual action. And taking those together and then also looking then at what the government actually said in its summation on the real estate scheme, the government described this meeting in June of 2011, and in its description of that meeting, there was no doubt that it was an essential step toward the legislation that was about to be passed. That was the reason. It was the only meeting that the government described as official action. There were many other meetings. So then what you're saying is that these additional instructions, together with the argument that you made during summation in Toto, would suggest that no reasonable jury would have necessarily found official act or governmental act based upon the meeting itself, but must have been thinking about the much broader quid pro quo activities extending over years. I mean, that's essentially what you're suggesting. That's largely true, Your Honor. But I also want to make it clear that the meeting that we're talking about was not the typical meeting that's standing alone that McDonnell was worried about. This was a meeting where the entire purpose and content, which is what the government described before calling this meeting official action, the purpose and the content was for Glenwood to communicate its confidential position that the other real estate developers did not hold so that Sheldon Silver could put that into the legislation he was on the eve of negotiating. That's the June 11, 2010 meeting. That's correct, Your Honor. 2011. June 6, 2011. Okay. Thank you very much, Mr. Klosner. Thank you. Mr. Muller, you've got two minutes left. I've given you each plenty of time, but I'll hold you to two. And then I will take them. I just want to hit a few points quickly here. First, on the O-Health legislation, there were many sponsors. It was not just Mr. Silver. The executive director testified there was absolutely no threat and that the son was more than qualified. On the 421A, the testimony that was given was the question asked, at that point in time, this is of the Glenwood lobbyists, at that point in time, 421A was not all that controversial. Is that correct? Answer, not that year. On the separate meetings that were done with respect to the real estate legislation, if you go to the record at Appendix A-142 to A-143 and you see in the indictment, Paragraphs 13B charges a meeting as a separate act and C, as a meeting as a separate act, and D, the legislation itself as a separate act. So there's no question that the government did separate those out and then argued to the jury, again, that meeting, ladies and gentlemen, that meeting is official action. You know, we heard about this point about the jury having found an exchange for, a scheme for exchange of grants for referrals. There's clear evidence that it ended in 2007. It's not illegal, it's not illegal for Mr. Silver to go to Dr. Taub and ask for referrals. And it's not illegal for Dr. Taub to say, I want to give Sheldon Silver referrals to curry favor for him. The Ganim case in this court, you know, holds that very thing. What's illegal is a quid pro quo for an official action as defined under McDonald. So this whole evidence about visits after the fact, the jury could have found that. And that's what we really come back to because what the government was saying is that this is what we intended. The question is, what were they told? What was the jury told? And they were told that any one of these acts is sufficient to convict. And their burden, their burden, is to prove that in erroneous obstruction, we will require a new trial unless it's harmless beyond a reasonable doubt. In other words, beyond a reasonable doubt, could a rational jury have found the defendant guilty if instructed correctly? And we just don't know because they made the choice to try the case without a special verdict form, knowing that McDonald was out there, and now they're trying to escape that responsibility here today. We're entitled to, at a minimum, a new trial. Thank you for all of the time that you've given us this morning. Thank you, both. Both sides. We reserve decision. We are adjourned. We are adjourned.